### IN THE

# SUPREME COURT

### OF

# NEW JERSEY.

## SEPTEMBER TERM, 1790.

[424]          THE STATE v. WELLS.

1. In order to excuse a homicide on the ground of self defence, it must clearly appear that it was a necessary act, in order to avoid destruction, or some severe calamity.

2. Though there may be a written confession of the accused, taken before a judge, parol testimony of acknowledgments or confessions made on other occasions are admissible in evidence.

3. Evidence of general character is admissible in a criminal prosecution, but it is entitled to little weight, unless where the fact is dubious or the testimony presumptive.

4. Where justice has been done by a verdict, there ought to be no new trial, even in a criminal case, although there may have been a misdirection of the judge in an unimportant particular.

This was a motion for a new trial. The defendant had been indicted at the Oyer and Terminer, in Morris county, for manslaughter, in killing one James Cooper, and being arraigned on the indictment, he pleaded not guilty.

The defence attempted to be set up on the trial was that

486

the homicide was excusable, and his counsel earnestly contended he was guilty of nothing more.

The jury, however, found a verdict of guilty.

Some doubts arising whether the judge who tried the cause had not misconceived the law, the judgment was respited upon the application of defendant's counsel, in order to take the opinion of the whole court upon a case stated, containing all the circumstances that had occurred, and the following case was made.

It appeared that there had been some misunderstanding between the deceased and the prisoner respecting a turkey, which was at the place where the deceased lived. On the [425] 23d of November, 1789, the prisoner came to the house of the deceased for the turkey, which he demanded; the deceased being then absent from home, at the house of one Jansen, a blacksmith. The wife of the deceased desired the prisoner would call again, when her husband should be at home, which he declined doing. She then told him that her husband had left word that if the prisoner took any fowl, he should take one particular one, which the prisoner, after looking at it, said that he would not have, but would go and see the deceased upon the subject; upon which she told him to take which he pleased. The prisoner then went out, caught a turkey, brought it into the house, and said that he had some business at the blacksmith's, where he should see the deceased and settle with him for the fowl. The wife then requested he would not go there, expressed her apprehensions lest he might get into a quarrel with her husband, and wished him to go home with the turkey, which he promised he would do.

The prisoner took the turkey and carried it to his own house, which was about a mile and a half distant from that of the deceased. After remaining at home some time, during which he was assisting his brother in some work, he took a shovel, which required mending, at the desire of his brother, to the blacksmith's shop, which was about half-way between

where the prisoner lived and the house of the deceased.   He found the deceased at the shop, standing near the door.  After some words had passed upon the subject of the prisoner's taking the turkey, the deceased appeared angry, gave the prisoner some harsh language, calling him a thief.  The prisoner then went into the shop, the deceased following immediately after him, jostling the prisoner with his elbow, and using extremely abusive language, the prisoner at this time making no resistance.    When they had got into the shop, and after some further words had passed relative to their taking the law of each other, the deceased said if it was not for the law he would whip the prisoner, and the latter replied he need not be afraid of that, and he was ready for him.  Thereupon the deceased made up to the prisoner, struck him, and seized him by the hair, when the prisoner caught him by the thigh or round the body, and ran him up into a corner of the [426] shop, when the blacksmith interfered, parted them, gave to each his hat, and expostulated with them.

After they were separated the deceased and the prisoner were standing several feet apart, when the quarrel was renewed, the deceased first using aggravating language, to which the prisoner replied in a similar strain, when the former stepped up and struck the latter, who returned the blow and struck the deceased in the face.  The prisoner, upon receiving the blows from the deceased, fell against the vise, when he took up a club and struck the latter a blow, which knocked him down and occasioned his death.

It also appeared from the testimony, both of the blacksmith and his son, that when the prisoner gave the fatal blow, he could not, in their opinion, have retreated further; that near the place where he took up the club with which he struck the deceased there were also the handle of a dung-fork, some blacksmith's hammers, and some old scythes, any of which the prisoner might have taken in his hand as easily as the club with which he gave the mortal stroke.

It appeared that the fracture in the skull of the deceased

was upwards of five inches in length, and about an inch and a half in breadth, and the bones were much broken.

Two of the witnesses also swore that the prisoner, in conversation with them afterwards, on the day the affray occurred, declared to them he could manage the deceased almost as he pleased. To another of the witnesses he said the deceased was no more in his hands than a child; and to another, that when the deceased struck him in the second affray, he looked toward the door in order to go out, but as he could handle the deceased as he pleased, he thought it would appear cowardly, and he would not do it.

The defence set up by the prisoner's counsel was that of excusable homicide. After citing several authorities to show what was the legal signification of this phrase, they examined one or two witnesses to show that the prisoner was on friendly terms with the deceased, and to rebut an idea which had been rather intimated than proved, that there was a previously subsisting quarrel between them.

[127] The judge, in his charge to the jury, having observed that, as the act of homicide was fully proved, and, indeed, admitted on behalf of the prisoner, told them the subject of their inquiry was whether the prisoner at the bar was guilty, as he stood charged in the indictment, or not; that homicide was, in some cases, justifiable, and in others was excusable; but he remarked, that whoever would shelter himself under the plea of self defence, more particularly in the case of a mutual conflict, must make it appear that, before the mortal stroke was given, he had declined any further combat; that he had retreated as far as it was possible to do with safety, and that he killed his adversary through mere necessity, in order to avoid his own destruction.

He informed them, further, that it was the peculiar province of the jury, after hearing the evidence given, to determine in their own minds whether, upon the evidence so given, the prisoner, before striking the mortal blow, had retreated as far as he could with safety, and whether he had

killed his adversary through mere necessity, and for the preservation of his own life. If they should be satisfied that he had not failed in either of these circumstances, they would acquit the prisoner; if otherwise, it was their obvious duty to find him guilty, as charged in the indictment.

The jury, after being out some time, sent a note to the judge, requesting permission to come into court, which, being granted, they accordingly came, and, by their foreman, desired again to hear the testimony of the blacksmith and his son, who were called, and repeated their testimony, much to the same purport as before, but said that the prisoner, upon being struck in the second affray, fell up against, or retreated to the side of the shop. The jury then requested the judge again to state to them the law relating to excusable homicide.

The judge repeated, in substance, what he had before stated, with this further remark—that although it might be contended, from some of the authorities which had been cited, that after a person assaulted had retreated as far as it was in his power, to avoid a battery or some bodily harm, it would be excusable in him to protect himself from further injury by killing his adversary, yet he thought this was not a principle [428] warranted by the law, but that the observations which he had before made, and the limitations he had pointed out, coincided with the ideas of Sir Michael Foster, and were grounded in reason, for, were it otherwise, the life of the citizen would be unnecessarily endangered, and would be taken away at too easy a rate.

During the trial, the counsel for the state offered testimony to prove the conversations of the prisoner relative to the affray. This was objected to, on behalf of the prisoner, upon the ground that his written confession had been already read in evidence. The court, however, overruled the objection, and admitted the evidence.

The counsel for the prisoner offered evidence to prove the characters of the deceased and of the prisoner. This was objected to, and the objection allowed.

The motion for a new trial was argued by *Aa. Ogden* and *R. Stockton*, for the prisoner, and *Woodruff*, attorney general, for the state.

KINSEY, C. J.   There are three grounds upon which the counsel for the prisoner found their application for a new trial :

1st.  It has been contended that the judge who presided at the trial, misconceived the law, when he charged the jury that, to excuse the commission of homicide as done *se defendendo*, it ought to appear the killing was through mere necessity, and to prevent his own destruction ; otherwise, it amounted to manslaughter.   The counsel have urged that this principle was laid down by the court in too broad and unlimited a manner; that the apprehension of an enormous battery would equally excuse the killing of an adversary ; and the circumstances of this case warrant the application of this principle of defence.

2d.  The judge was wrong in admitting parol evidence of a confession of the prisoner, variant from the written confession, taken in a more solemn and authoritative form.

3d.  That evidence of the general characters of the prisoner and the deceased was improperly overruled.

[429] With regard to this last point, I think clearly that the court was mistaken.   The defendant has an unquestionable right to adduce testimony tending to show his general good and pacific character, and to let it have what weight it may be entitled to with the jury.   Still, if evidence of this kind is admitted, I should think it my duty to inform the jury, that it should receive little attention in any case, unless where the fact is itself dubious, or where the charge rests altogether upon presumptive testimony.   Against the positive declarations of honest witnesses, it ought not to be permitted to weigh.

Upon the second point, the court was unquestionably right.   No authority has been adduced by the prisoner's counsel to support the doctrine for which they contend, and the argu-

ment that has been offered is far from convincing. I take the law to be, that parol evidence of the confession before the justice would be improper; but confessions made at another time and place, although different from that made before the justice, are evidence. Indeed, upon any other principle, this monstrous consequence would ensue, that if a criminal had twenty times acknowledged the commission of a fact, and should afterwards refuse to confess it, upon an examination before the justice, for the very purpose of preventing any proof of his former acknowledgments, he would, by his own act, defeat the ends of justice. *Fearshire's case, Leach* 446, and *The King* v. *Jacobs et al., Ibid.* 285, establish this fully.

We now come to the most material question in this case, viz., whether the offence proved to have been committed by the prisoner comes up to the legal signification of the word manslaughter; and I am of opinion it does.

A reference to *Nailor's case, Foster* 278, is sufficient to remove all doubt upon this point. In that case, the prisoner was indicted for the murder of his brother, and the circumstances, as they appeared in evidence, were, "that the prisoner, on the night the fact was committed, came home drunk. His father ordered him to go to bed, which he refused to do; whereupon a scuffle ensued between the father and son. The deceased, who was then in bed, hearing the disturbance, [430] got up, and fell upon the prisoner, threw him down, and beat him upon the ground; and there kept him down, so that he could not escape nor avoid the blows. While they were thus striving together, the prisoner gave the deceased a wound with a pen-knife, of which wound he died." Some doubts existing in the minds of the judges, a special verdict was found, stating these circumstances, and, upon a conference with all the judges of England, it was unanimously holden to be manslaughter—"for there did not appear to be any inevitable necessity, so as to excuse the killing in this manner." In a note to this case, which I presume to be Foster's, it is said the deceased did not appear to aim at the prisoner's life,

but rather to chastise him for his misbehavior and insolence towards his father.

In the present case, the attack of the deceased was without any kind of weapon that might have rendered it necessary for the prisoner to avail himself of the instrument which occasioned the death. On his own confession, much less would have been sufficient, and I consider it, therefore, as clearly manslaughter.

What I particularly allude to, is the declaration of the prisoner to the witnesses who have been sworn, made soon after the affray, that he could manage the deceased as he pleased, and that he was no more than a child. These declarations show there could have been no necessity for the weapon, and they are proper to be relied upon. See also the case of *Rex* v. *Oneby*, 2 *Ld. Ray.* 1485.

The observations I have made render it unnecessary to enter further into the discussion of the question that has been raised, than to remark that, in my opinion, no man is justified or excusable in taking away the life of another, unless the necessity for so doing is apparent as the only means of avoiding his own destruction or some very great injury, neither of which appears to have been reasonably apprehended in the present case.

Upon the whole case, I am of opinion that there should be no new trial; for if justice has been done, and if the result of another trial ought to be the same as this, and the court are decidedly of this opinion, though the judge may have directed the jury improperly, or have rejected evidence which, strictly speaking, ought to have been admitted, yet a new trial should not be granted, and would in no degree advance the ends of justice. *Edmonson* v. *Machell*, 2 *T. R.* 4.

In considering this question, I have purposely avoided mentioning many circumstances which operate strongly against the defendant, which show that he was fully as eager for the combat as the deceased; that he manifested no inclination to

decline the affray which led to the unhappy circumstance which has brought down a just but severe punishment upon himself.

·   New trial refused.

CITED *in Den* v. *Steelman*, 1 *Harr.* 68.